UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

THE UNITED STATES OF AMERICA                                          04-CR-100E

              -vs-                                                           MEMORANDUM
                                                                                    and
DANIEL KOCHMANSKI                                                          ORDER[1]

_____

          Defendant Daniel Kochmanski has been charged by indictment with (1)

knowingly possessing a firearm with an obliterated serial number and

ammunition after having been previously convicted of a crime punishable by a

term of imprisonment exceeding one year in violation of 18 U.S.C. §§922(g)(1) and

924(a)(2), (2) knowingly possessing a firearm that had the manufacturer's serial

number removed, obliterated and/or altered and that had been previously shipped

and transported in interstate commerce in violation of 18 U.S.C. §§922(k) and

924(a)(1)(B) and (3) knowingly attempting to place a loaded firearm on an aircraft

intended for operation in air transportation and in property not accessible to

passengers in flight in violation of 49 U.S.C. §46505(b)(2).  The undersigned

referred the case to United States Magistrate Judge H. Kenneth Schroeder, Jr.

pursuant to 28 U.S.C. §636(b)(1)(B) for all pre-trial matters and to consider and

report upon dispositive motions therein.  Defendant, on August 16, 2004, moved

to suppress (1) the seizure of items from his luggage, (2) all evidence seized from

_____

          [1]This decision may be cited in whole or in any part.

his home pursuant to a search warrant and (3) his statements ("Suppression Motion").   A suppression hearing was held on October 6 and continued on October 26, 2004 during which the government called Sean Glennon, a Security Screener employed by the Transportation Security Administration ("TSA") at the Buffalo Niagara International Airport ("BNIA"), and three Niagara Frontier Transportation Authority ("NFTA") Police Officers — Robert Gawlak, John L. Popp and John Politowski.   Judge Schroeder's Report and Recommendation ("R&R") dated April 8, 2005 recommended that the Suppression Motion be denied in part and granted in part.   On May 10, 2005 defendant filed objections to portions of the R&R ("Defendant's Objections") as did the government (the "Government's Objections") (collectively "both Objections").   For the reasons set forth below, the R&R will be adopted in its entirety and both Objections will be overruled.

This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate" and may adopt those parts of the R&R to which no *specific* objection is raised, so long as such are not clearly erroneous.   28 U.S.C. §636(b)(1)(c); *see also Black* v. *Walker*, 2000 WL 461106, at *1 (W.D.N.Y. 2000).   Conversely, the undersigned must make a *de novo* determination with respect to those portions of the R&R to which specific objections have been made.   28 U.S.C. §636(b)(1)(c); *United States* v. *Raddatz*, 447 U.S. 667, 675-676 (1980); *Sieteski* v. *Kuhlmann*, 2000 WL 744112, at *1 (W.D.N.Y.

2000).   Both Objections satisfy Rule 58.2(a)(3) of the Local Rules of Criminal

Procedure ("LRCrP"), which states:

> "The written objections shall specifically identify the portions of the
> proposed findings and recommendations to which objection is made
> and the basis for such objection and shall be supported by legal
> authority."

All the issues addressed in the R&R were raised by both Objections.  As such, the

undersigned will make a *de novo* determination as to the issues raised in the

Suppression Motion.

Although the R&R set forth the facts in detail, a thorough re-examination of

the facts is necessary here.  Defendant and his family arrived at BNIA on January

4, 2003 and checked their luggage with the airline on a flight destined for Cancun,

Mexico.  Passengers at BNIA are screened prior to entering a "sterile" area, which

includes the gate/boarding area and the checked baggage area.  Prior to entering

the gate and boarding areas, passengers are required to remove all items from

their pockets and subject themselves and their carry-on luggage to a search via

an X-ray machine.  If the X-ray machine detects something questionable inside

the luggage, the luggage is subjected to a physical inspection by the screener.

If, at any point, a passenger either does not consent to the search by the X-ray

machine or the subsequent physical inspection, the passenger will not be allowed

to enter the sterile gate area.

Similarly, passengers who check their luggage must give their bags to an airline representative at the check-in counter.  Once this occurs, the luggage is taken to the sterile checked baggage area to be screened by an "L3 detection machine" ("the L3"), which is a type of X-ray machine that detects the densities of certain materials in order to detect explosives.  The L3  allows TSA agents to scan and inspect luggage that will be placed on airplanes as checked baggage. Each checked baggage in BNIA, as of the very end of 2002 or beginning of 2003, is scanned by the L3.  Prior to such time, however, checked bags at BNIA were not screened and it is unclear whether after such time passengers were explicitly notified that their checked baggage would be screened.  As a checked bag goes through the L3, an image of the entire bag is taken, allowing the TSA agent to see inside the bag.  If an object inside the bag triggers an "alarm", the bag will be physically examined by a TSA agent.  TSA agents are not law enforcement officers, but are trained to work with law enforcement personnel — in particular, with NFTA officers.

On January 4, 2003 Glennon was one of the TSA agents screening the checked baggage with the L3.  Defendant's suitcase caused an "object alarm" and Glennon was brought over to physically inspect the suitcase.  Glennon saw on the screen of the L3 what he thought was the shape of a gun inside an electronic device.  Glennon notified his supervisor and, in accordance with procedure, they placed the bag on a table for Explosive Trade Detection ("ETD")

sampling.  Glennon sampled the outside of the bag and determined that the bag did not contain any explosives.  Glennon and his supervisor then broke a plastic lock securing defendant's suitcase, opened defendant's suitcase and "went for the target object ✱✱✱ [and] [s]aw that it was a cable box."  (Oct. 6, 2004 Hr'g Tr. at 34.)  The cable box was contained in a cardboard box on which Glennon and his supervisor conducted an ETD test.  The ETD came back negative.  They then opened the cardboard box and found the cable box underneath a piece of foil.  They conducted another ETD test on the outside of the cable box, which again tested negative.  Glennon testified that, when picking up the cable box while testing for explosives, he felt something move inside the box, looked through the vents and "saw something in there."  (*Id.* at 37.)  In particular, Glennon testified that he saw "something shiny that shouldn't have been there, something out of the ordinary."  (*Ibid.*)  He asserts that he was "pretty sure" it was a gun, so his supervisor ran the cable box through the L3 and saw the outline of what appeared to be a gun on the screen.  Although a firearm may be taken on an airplane through checked luggage, it must be accompanied by a declaration indicating that the firearm was made known to the airline and it must be contained in its own locked case with the ammunition outside of the case.   Glennon and his supervisor did not see a declaration accompanying what appeared to them to be a gun in defendant's suitcase, so they notified the NFTA police.

NFTA Officers Gawlak and Politowski responded to the TSA Agents' call. Upon their arrival at the sterile checked baggage area, they received a printout of an image depicted by the L3, which they believed outlined what seemed to be a weapon — *viz.*, a pistol or a gun —, but could not tell if it was a real weapon or a toy weapon or replica of such. Although he may have had a suspicion that the gun was real, Officer Gawlak "didn't have enough at that time to actually arrest someone for possession of a weapon ***." (Oct. 26, 2004 Hr'g Tr. at 19.) Officer Gawlak was told that defendant's suitcase and cardboard box had been "screened". Officer Gawlak inquired from the airline if any weapon had been declared and received a negative response. He then determined that the luggage belonged to defendant and Officers Popp and Politowski proceeded to the terminal to find defendant.

Without seeking a warrant or defendant's permission — both of which he admittedly had plenty of time and opportunity to obtain —, Officer Gawlak removed the cable converter from its cardboard box, opened the cable box by unscrewing four screws and discovered that the cable box contained a real handgun and ammunition — the gun itself was not loaded. The contents of the cable box were photographed and the Federal Bureau of Investigation ("FBI") was notified. Upon arrival of the FBI agents, the NFTA's role in the investigation ceased.

Meanwhile, Officers Popp and Politowski found defendant and Officer Popp asked him if — and defendant admitted that — he had packed "a black metal transistor type box" in his checked luggage.   (Oct. 26, 2004 Hr'g Tr. at 41.) Defendant was immediately handcuffed, placed under arrest, advised of his *Miranda* rights and taken to a detention area.   Defendant indicated that he understood his rights and was willing to cooperate; however, according to Officer Popp, defendant "became very, very nervous [and] started shaking."   (Oct. 26, 2004 Hr'g Tr. at 43-44.)   Approximately an hour and a half later, Officer Popp read defendant his rights from a *Miranda* card and had defendant sign the card. Defendant indicated that he understood his rights and stated that he was willing to cooperate.

FBI agents arrived at the scene, viewed the opened cable box in which was a Ramon Arms .25 Caliber semi-automatic weapon with an obliterated serial number and began questioning defendant.   Defendant admitted to having the cable converter box but denied knowledge of any weapon inside the box. Eventually, defendant indicated that he wanted an attorney, at which point the FBI agents ceased questioning him.   Defendant was taken into custody on January 4, 2003 and charged with violating 49 U.S.C. §46505(b)(2) and 18 U.S.C. §§922(k) and 922(g)(1).

On January 29, 2003 FBI Special Agent Kenneth Jensen made an application for a search warrant seeking authorization to enter defendant's home to "search

the entire residence *** and remove samples of any blue/green carpeting or any carpeting located throughout the residence similar thereto for testing, and possible matching, at the F.B.I. Laboratory." This application was made because "a plug of blue/green low pile carpeting" had been found "as the loaded magazine from the weapon [found in defendant's baggage] was unloaded." A search warrant was issued based on Jensen's application and, on January 31, 2003, the FBI entered defendant's residence and took carpet samples throughout his residence. The FBI also took almost sixty photographs of various areas in the residence during the search.

Judge Schroeder's R&R first analyzed the airport search, then proceeded to review the admissibility of defendant's statements to NFTA Officers and lastly addressed the admissibility of evidence seized from defendant's residence. Defendant first objects to the R&R's recommendation that the Court deny defendant's motion to suppress all evidence seized as a result of the search of defendant's luggage. The R&R found that the screening of defendant's luggage by the L3 constituted a search within the meaning of the Fourth Amendment and that the legality of the search did not rest on a consent theory, but was based on the reasonableness of the search in light of the totality of the circumstances — to wit, the heightened risk of terrorism in air travel in the post-September 11, 2001 world.

The Fourth Amendment protects people from unreasonable government intrusions into their legitimate expectations of privacy, and such protections extend to the contents of personal luggage. *United States* v. *Place*, 462 U.S. 696, 706-707 (1983). Thus, a search of luggage is "a search within the meaning of the [F]ourth [A]mendment." *United States* v. *Albarado*, 495 F.2d 799, 803 (2d Cir. 1974). Although subject to the Fourth Amendment's reasonableness requirement, airport searches are "carried out upon each and every passenger without warrant or without probable cause." *Ibid.* Airport searches are a direct reaction to the need to safeguard flights from, *inter alia*, hijackings which began in 1968 and terrorist bombs which became a reality after the events of September 11, 2001. *See ibid.* Still, airport searches must comport with the principles of reasonable searches and seizures. *See Terry* v. *Ohio*, 392 U.S. 1, 20 (1968) "'[T]he conduct involved *** must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures,' since an airport search[,] 'as a practical matter, could not be subjected to the warrant procedure.'" *Albarado*, at 804 (quoting *Terry*, at 20). The Second Circuit Court of Appeals has held that, with regard to airport searches, "[t]he ultimate standard of the [F]ourth [A]mendment *** is one of reasonableness[, which] depends upon the facts and circumstances and the total atmosphere of each case." *Ibid.* Thus, the question here is whether, in light of the totality of the circumstances as they were in the

BNIA on January 4, 2003, the inspection of defendant's luggage by the L3 and the subsequent search by the TSA Agents and NFTA Officers were reasonable.

In determining the validity of the search of defendant's luggage, the Court must balance the need for the search — to wit, the governmental interest which supposedly justifies intrusion on the privacy of the person — against the invasion of privacy involved. *Id.* at 804-805. Here, in light of the events of September 11, 2001, "the danger alone meets the test of reasonableness". *United States* v. *Edwards*, 498 F.2d 496, 500 (2d Cir. 1974).

Defendant claims that he did not consent to the search of his luggage inasmuch as he was allegedly not aware that checked luggage would be searched and such searches at BNIA had begun just prior to January 4, 2003. In response, the government contends that there were signs posted throughout the terminal indicating that all checked luggage would be subject to search. The R&R held that, although it was highly unlikely that, in the post-September 11th world, defendant would not have known that his checked luggage may be searched, defendant's knowledge of or consent to the search is not necessary because the legality of the search rests on a reasonableness rather than a consent theory. Based on the evidence before the Court, it is unclear whether there were signs posted throughout the BNIA — and even more unclear if defendant saw any such signs — warning passengers that their checked luggage would be subject to a search. And, although the undersigned joins in Judge Schroeder's disbelief that

defendant was completely unaware of the possibility that his checked luggage would be searched given the media attention on airport security after September 11th, the existence or lack of warning signs is "not necessarily fatal" to the legality of the search. *Albarado*, at 808. The Second Circuit has held that "the legality of the [airport] search does not rest on a 'consent' theory, but rather on a reasonableness of the total circumstances". *Ibid.* As the *Albarado* Court explained, an otherwise unlawful search becomes lawful with the free and voluntary consent of the person; such consent, however, cannot occur in the realm of air travel because "forc[ing] one to choose between [the] necessity [to fly] and the exercise of a constitutional right is coercion in the constitutional sense." *Id.* at 807. Thus, the Court need only determine if the search of defendant's luggage was reasonable.

First, it is important to acknowledge that there is a compelling need to search checked luggage for explosives, which is the purpose of the L3. The events of September 11th coupled with the subsequent threats and attacks internationally to air travel provide more than sufficient justification for heightened security. The L3 screens everyone's checked luggage, thus there is no discrimination or other stigma attached to such a search. Furthermore, the screening — similar to the canine sniff in *Place*, at 707, and the magnetometer search in *Albarado*, at 806, — is minimally invasive for it does not require the opening of the luggage in question and does not expose any private, non-

contraband items.  *See also United States* v. *Cyzewski*, 484 F.2d 509, 512 (5th Cir.

1973) (finding that airport searches of checked luggage are "justified as a limited

and relatively insignificant intrusion of privacy balanced against the need to

protect [the] aircraft and its passengers").  Thus, at its inception, the screening

by the L3 of defendant's luggage and of the luggage of all passengers was

reasonable.

      To withstand Fourth Amendment scrutiny, however, the search must be

"'strictly tied to and justified by' the circumstances which rendered its initiation

permissible."  *Terry*, at 19.  "As long as the scope of that initial search comported

with the Fourth Amendment--i.e., was no more intrusive than necessary to

accomplish its purpose of detecting weapons or explosives--then it is of no

constitutional moment that the object found was not what was sought."  *United

States* v. *$557,933.89, More of Less, in U.S. Funds*, 287 F.3d 66, 81-82 (2d Cir. 2002).

Thus, once the L3 indicated an "object alarm", the further inspection of

defendant's bag by TSA Agent Glennon was justified.   Without further

investigation subsequent to the object alarm, the L3 would not serve any valid

purpose.  *Albarado*, at 808.  The image on the L3 indicated a possibility that

something resembling a gun was inside defendant's bag and "necessitate[d] that

further measures be taken."  *Ibid.*  To determine if the image was indeed a real,

undeclared gun, the TSA Agents and NFTA Officers had to open the luggage and

search further.  *See, e.g., United States* v. *Pulido-Baquerizo*, 800 F.2d 899, 902 (9th

Cir. 1986) ("[A]n airport screening agent has a duty to ferret out firearms and explosive devices carried by passengers. *** This duty could not be fulfilled if the agent was prohibited from conducting a visual inspection and limited hand search after an inconclusive x-ray scan.").  The search of defendant's luggage was limited to the object detected by the L3 and was reasonable "because no lesser readily available means *** exist[ed] for determining what unexplained *** object" was packed in defendant's luggage.  *Albarado*, at 808.  The TSA Agents briefly investigated the circumstances that aroused their suspicions — *viz.*, the image of what appeared to be a gun on the L3 — and limited their search to just the target object — *viz.*, that which seemed to contain the gun.

Next, it was not only reasonable for the NTFA Officers to remove the cable box from defendant's bag, but the Officers had probable cause to detain defendant's luggage to determine if inside the bag there was a real, undeclared gun.  When luggage appears to contain contraband or evidence of a crime, seizure of the luggage is permitted "on the basis of reasonable, articulable suspicion premised on objective facts" for a limited purpose of confirming or dispelling the suspicion.  *Place*, at 702.  Here, the search was limited in scope as it was aimed only at the target object and the Officers' suspicions were more than reasonable as no declaration was found and the item detected appeared to be a gun.  *See, e.g., Albarado*, at 809 ("If an officer comes lawfully upon concealed items, he may require that they be opened to his inspection ***.").   Therefore, Defendant's

Objections to the R&R's recommendation that defendant's motion to suppress evidence obtained from the seizure of defendant's luggage be denied will be dismissed.

Judge Schroeder then analyzed the interrogation of and statements made by defendant and recommended that defendant's motion to suppress his statements be denied.   The R&R found that the Officers were justified in conducting a *Terry* stop of defendant.  Defendant, however, maintains that he was in custody and should have been immediately advised of his *Miranda* warnings. To determine whether a *Terry* stop is reasonable, it must first be "justified at its inception" and second be "reasonably related in scope to the circumstances which justify the interference in the first place."  *Terry*, at 20.  It is undisputed that the line of questioning conducted by the NFTA Officers was reasonably related to the circumstances.   Thus, only the first prong of *Terry* is in dispute, with defendant claiming that no reasonable suspicion existed.

Upon discovery of the gun and ammunition in defendant's luggage, the NFTA Officers had "reasonable suspicion" to believe that criminal activity "may be afoot" and a "objective manifestation" that defendant was "engaged in criminal activity" so as to justify the initial, brief "investigatory stop" of defendant.   "[T]he Fourth Amendment permits police officers to approach individuals at random in airport lobbies *** to ask them questions and to request consent to search their luggage, so long as a reasonable person would understand

- 14 -

that he or she could refuse to cooperate." *Florida* v. *Bostick*, 501 U.S. 429, 431 (1991).  A police officer is entitled to detain a person who he reasonably suspects has committed or may commit a crime "in order to investigate the circumstances that provoke[d] the suspicion[— to wit,] the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officers' [*sic*] suspicions." *Berkimer* v. *McCarty*, 468 U.S. 420, 439 (1984).  The detainee, however, is permitted not to answer questions if he so chooses. *Ibid.*  In the instant case, given the undeclared gun conspicuously hidden in a cable box in defendant's suitcase, the NFTA Officers had the requisite reasonable suspicion to conduct a *Terry* stop.  In particular, taking an undeclared gun on an airplane is a violation of 49 U.S.C. §46505(b)(2) and thus, almost by definition, criminal activity *was* afoot.  When defendant said that he had packed the cable box in his luggage, he was immediately placed under arrest and advised of his *Miranda* rights and the Officers had probable cause to place him under arrest.  As such, the arrest of defendant was lawful and Defendant's Objections to the R&R's recommendation that defendant's statements be deemed admissible will be dismissed.

Finally, the R&R found that the FBI's taking of photographs during the execution of the search warrant exceeded the scope of the warrant.  The government objects to this recommendation claiming that the taking of photographs did not interfere with defendant's possessory interests and thus was

not a seizure of evidence.  The search warrant authorized the FBI Agents to search and seize samples of any blue/green carpeting or any carpeting located throughout the house.  The government contends that the Agents were thus authorized to search every room, closet, drawer or bin and could view everything in plain view.  The government took approximately sixty photographs of the interior and exterior of defendant's residence.  The search warrant, however, did not authorize the taking of photographs, which, although an intangible, is considered a search and seizure.  *United States* v. *Villegas*, 899 F.2d 1324, 1334 (2d Cir. 1990).  ("[T]he Fourth Amendment extend[s] to searches for and seizures of intangibles as well.")  That which is listed in the search warrant is all to be seized and "nothing is left to the discretion of the officer executing the warrant."  *Marron* v. *United States*, 275 U.S. 192, 196 (1927).  The photographs were not authorized by the search warrant and thus are inadmissible.

The government's alternative argument — to wit, that the photographs were of what was in plain view — also fails.  The plain view doctrine only authorizes the seizure of items that the officer has probable cause to suspect is "connected with criminal activity."  *United States* v. *Scapo*, 19 F.3d 777, 782 (2d Cir. 1994).  It has not been alleged or shown that defendant's residence is in any way connected with criminal activity.  As such, the plain view doctrine does not apply and the Government's Objections will be dismissed.

Accordingly, it is hereby **ORDERED** that the Government's Objections are overruled, that Defendant's Objections are overruled and that Judge Schroeder's Report and Recommendation dated April 8, 2005 (docket no. 50) is adopted in its entirety.

DATED:      Buffalo, N.Y.
            November 29, 2005

                                    _____/s/ John T. Elfvin_____
                                          JOHN T. ELFVIN
                                          S.U.S.D.J.